UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | Cr. No. 07-131 ML |
| | : | |
| THOMAS THOMSEN | : | |

GOVERNMENT'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS COUNTS I-III OF THE INDICTMENT

Comes now the United States of America through its attorneys, Robert Clark Corrente, United States Attorney for the District of Rhode Island and Assistant U.S. Attorney Adi Goldstein, and objects to Defendant's Motion to Dismiss for the reasons set forth in the attached Memorandum of Law.

Respectfully submitted,
UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Adi Goldstein
ADI GOLDSTEIN
Assistant U.S. Attorney
RI Bar #6701
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email adi.goldstein@usdoj.gov

CERTIFICATE OF SERVICE

On this 4th day of September, 2007, I caused the Government's Objection to Defendant’s Motion to Dismiss Counts I-III of the Indictment to be filed electronically and it is available for viewing and downloading from the ECF system.

Edward C. Roy

/s/ Adi Goldstein
ADI GOLDSTEIN
Assistant U.S. Attorney
RI Bar #6701
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email adi.goldstein@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | Cr. No. 07-131 ML |
| | : | |
| THOMAS THOMSEN | : | |

MEMORANDUM IN SUPPORT OF GOVERNMENT'S OBJECTIONTO DEFENDANT'S MOTION TO DISMISS COUNTS I-III OF THE INDICTMENT

Defendant moved to dismiss Counts One, Two and Three of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B). Defendant argues that the Indictment is defective because it fails to allege that the defendant knew that the anabolic steroids were possessed illegally by his customers and because it failed to allege that the drugs were in fact possessed illegally. Def. Mem. at 3. For the reasons set forth below, Defendant's arguments are without merit. First, the Indictment is sufficient as it sets forth all the elements of the offense. Second, Supreme Court precedent clearly defines the "knowledge" requirement under 21 U.S.C. § 863, and provides that the defendant need only know that the items are likely to be used in conjunction with unlawfully possessed controlled substances. Third, it is axiomatic, and in this case, statutorily prescribed, that the Indictment need not allege statutory exceptions that are in the nature of affirmative defenses. At best, the arguments

raised by the Defendant involve mixed questions of fact and law, properly decided at trial and not on a motion to dismiss the Indictment. Accordingly, defendant's motion should be denied.

## I. Relevant Facts

In the Fall of 2006, as part of a nationwide investigation into the unlawful distribution of steroids and human growth hormones, members of the Food and Drug Administration, Office of Criminal Investigation (FDA-OCI) honed in on a website titled www.universalkits.com. Based on their analysis of the items sold on this website, the agents determined that the site was used to sell items that are primarily designed to convert powder steroids, considered to be "raw material," into a liquid form that can be readily injected into the human body. This type of conversion is often used by body-builders and athletes who are seeking improved performance, increased muscle mass, and lower body fat. It is inconsistent with lawful use of steroids which would normally entail filling a prescription at a pharmacy and obtaining a finished product, be it a gel, cream, or pill that is FDA approved. The raw steroids are not authorized for general distribution, they are not obtained through legitimate prescriptions, and are not utilized for the treatment of recognized medical conditions or diseases.

Thus, on each occasion alleged in Counts I-III of the Indictment, the defendant, Thomas Thomsen (THOMSEN) sold a confidential source (CS) working at the direction of the FDA-OCI "kits," or a combination of items, that are used to convert powder steroids into a form that can be injected into the human body. On October 31, 2006, the CS logged onto THOMSEN's website, www.universalkits.com, and sent an e-mail indicating that the CS wished to place an order for "a kit to convert fina pellets" for the CS's "personal use." The CS also inquired as to what type of "kit" he would need to convert "three cartridges of Tran pellets." According to FDA agents involved in this investigation, the term "Tran" as used by the CS, is a slang term for the anabolic steroid Trenbolone, a Schedule III controlled substance. Trenbolone is commonly used to inject cattle and is not a substance that is prescribed to human beings. No Trenbolone compound has been approved by the FDA for human consumption to the Government's knowledge. The term "fina pellets" refers to the veterinary cattle implant Finaplix which contains Trenbolone Acetate. According to agents of the FDA-OCI, and certified agents of the DEA's clandestine laboratory enforcement team, certain individuals will sell or distribute "kits" that contain a combination of items that, if used in correct sequence, are designed to separate the binder in Finaplix

from the active steroid Trenbolone. The Trenbolone can then be converted clandestinely into a form that is more optimal for injection by people. Obviously, <u>nothing</u> about this process is consistent with the lawful possession and use of anabolic steroids: it involves no legitimate prescription, no legitimate product that is FDA approved, no legitimate medical use, and is distributed by individuals who are not authorized to possess or distribute steroids.

THOMSEN responded to the CS's e- mail with the following message: "You would need to purchase the 6g F-Type kit which will give you A Total yield of 60ml @ 100mg/ml and just request an oil other than peanut in the comment section at the time of your order, suggest Grapeseed and you will be fine." Subsequent to this communication, the CS ordered an "F Type kit" (6g kit, hypodermic needles and syringes, and alcohol prep pads) from the website. On November 13, 2006, agents retrieved a parcel delivered to an undercover post office box containing unlabeled, liquid-filled ampoules, hypodermic needles, syringes, and alcohol prep pads. Based on their training and experience, the agents recognized this "kit" as a combination of items that is commonly used to clandestinely convert raw steroids into a liquid form.

. In February 2007, the CS again engaged in a series of e-mail communications with universalkits regarding the purchase of a kit

to convert "Test Prop powder" (referring to the anabolic steroid Testosterone Propionate, a Schedule III controlled substance). The CS stated that the conversion process was painful and he inquired about various oils he should use for the conversion. THOMSEN, utilizing the web-e-mail customerservice@universalkits.com, responded to the CS that "The pain is in the dissolving solution and not so much the oil, although Grape Seed is from a fruit so there it may burn more than oil from a bean or nut extract. We suggest using peanut and we always use as little dissolving solution as possible." As can be gleaned from this e-mail, THOMSEN reasonably knew that he was selling items to an individual who was attempting to convert testosterone propionate powder (an anabolic steroid commonly used as a performance enhancer) into an injectable form for his personal use. Agents involved in this investigation know, based on their training and experience, that end users as well as underground labs can illegally purchase testosterone propionate in bulk form from foreign and domestic sources. This raw material can be converted into an oil-based injectable using a minimal amount of paraphernalia such as oil-based solvents and syringes. To state the obvious, this process is not consistent with lawful possession of testosterone propionate which would normally involve an individual walking into a pharmacy with a

physician's prescription and purchase a finished, FDA-approved, product. On March 6, 2007, agents retrieved a parcel from an undercover post office box which contained the following paraphernalia: one vial containing a clear liquid, two vials containing a yellow liquid, two empty gauge needles, one 25mm. filter, four alcohol prep pads, and two latex gloves.

In July 2007, the CS was again directed by agents to log onto www.universalkits.com and to place an order for paraphernalia. An e-mail conversation occurred between the CS and THOMSEN. The conversation included the following:

> CS: "Hey got a few questions on your liquid clen product listed on your site. I want to purchase a bottle just to lose some fat and try to lean out for the summer. The bottle on the picture says 100mcg/ml. How many CC's does the bottle dropper hold and how many mcg's you'd suggest I should take per day? m trying to drop around 15-20 pounds and my diet is in check. . . ."
> Customerservice@universalkits.com: "Sorry we are just buried right now with e-mails and having a hard time getting back with everyone quickly. The dropper is a half cc, <u>other than that we can't discuss usage as it is a research chemical and not sold for human consumption</u>. Go to the discussion forums and do a quick search there you will find all the information you need." (Emphasis supplied.)

Agents involved in this investigation know, based on their training and experience, that "clen" is a slang term for clenbuterol, a cattle implant that is not approved for human use but which may be used by body-builders in order to lose body fat. The reply e-mail clearly suggests that THOMSEN knew two things:

first, he was selling items that would enable the human use of clenbuterol; and, second, that it was unlawful for him to do so. THOMSEN was attempting to circumvent this illegality by directing the CS to internet "discussion boards" where he could obtain substantive information. Following this conversation, the CS placed an order on universalkits.com for a 30ml vial of clenbuterol and an "F-type" conversion kit similar to that previously purchased. On August 10, 2007, agents retrieved a parcel addressed to the undercover P.O. Box that contained unlabeled, liquid-filled ampoules, hypodermic needles, filters, syringes, and alcohol prep pads.

On or about August 20, 2007, agents of the FDA-OCI task force executed a search warrant at the residence of THOMSEN, 5008 West Lancaster Street, Tampa Florida. THOMSEN agreed to be interviewed by law enforcement agents. THOMSEN admitted, among other things, that he was the sole owner and operator of the website universalkits.com. Additionally, THOMSEN admitted that he advertised his business on as many as twenty websites, including steroidology.com and anabolicminds.com. THOMSEN also bought advertising space in the magazine Planet Muscle.

## II. The Indictment

On October 10, 2007, a legally constituted grand jury returned an eight-count indictment charging THOMSEN with

unlawfully selling and offering for sale drug paraphernalia, in violation of 21 U.S.C. § 863 (Counts I-III), and money laundering, in violation of 18 U.S.C. § 1956 (a)(1). Each of Counts I, II, and III of the Indictment provides that, on or about a certain date, in the District of Rhode Island and elsewhere, the defendant "did knowingly sell and offer for sale, drug paraphernalia, as that term is defined in 21 U.S.C. § 863(d)." While the charging language could have stopped there, each count provided the defendant with additional notice, arguably surplusage, describing in general terms the items constituting this paraphernalia.

## III. Governing Law

### A. Sufficiency of the Indictment

Federal Rule of Criminal Procedure 7(c)(1) requires only "that the indictment be 'a plain, concise and definite written statement of the essential facts constituting the offense charged.'" United States v. Serino, 835 F.2d 924, 929 (1st Cir. 1987) (quoting Fed. R. Crim. P. 7(c)(1)). The general rules is that "'an indictment is sufficiently particular if it elucidates the elements of a crime, enlightens a defendant as to the nature of the charges against which she must defend, and enables her to plead double jeopardy in bar of future prosecutions to the same offense.'" United States v. Whiffen, 121 F.3d 18, 21 (1st Cir.

1997) (quoting United States v. Sepulvada, 15 F.3d 1161, 1192 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994)); Portnoy v. United States, 316 F.2d 486 (1st Cir.) cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963). See also Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In evaluating an indictment for sufficiency, "common sense and reason prevail over technicalities." United States v. Sabbeth, 262 F.3d 207, 218 (2d Cir. 2001). To be sufficient, the elements of the indictment "need not always be set forth in haec verba. Indictments 'must be read to include facts which are necessarily implied by the specific allegations made.'" United States v. Barbato, 471 F.2d 918, 921 (1st Cir. 1973) (citation omitted). Thus, for instance, indictments need not always plead required scienter elements in precise statutory terms such as "willfully" or "knowingly" so long as other words or facts contained in the indictment "necessarily or fairly import guilty knowledge." Madsen v. United States, 165 F.2d 507, 509-10 (10th Cir. 1947); Hughes v. United States, 338 F.2d 651, 652 (1st Cir. 1964) (scienter element is sufficiently pleaded if "other allegations in the indictment compel an inference of intent").

A defendant seeking dismissal of an Indictment bears a heavy burden. This is because "'[a] motion to dismiss an indictment is not a device for a summary trial of the evidence, but rather is

directed only to the question of the validity of the indictment on its face.'" United States v. Marbelt, 129 F. Supp.2d 49, 56 (D. Mass. 2000) (quoting United States v. Vicenzi, 1988 WL 98634, *3 (D. Mass. 1988)). The allegations of an Indictment "must be taken as true." Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952). It is axiomatic that an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is sufficient to call for a trial of the charge on the merits. Costello v. United States, 350 U.S. 359, 363 (1956). A Court should not inquire into the sufficiency of the evidence before the indicting grand jury. See United States v. Mack, 892 F.2d 134 (1st Cir. 1989); United States v. Macio, 873 F.2d 1, 3 (1st Cir. 1989). When "the questions raised in the motion to dismiss the indictment involve mixed questions of fact and law, properly decided at trial, a motion to dismiss the indictment must be denied." Marbelt, 129 F. Supp.2d at 56.

Finally, "it has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defense[s]." United States v. Sisson, 399 U.S. 267, 288, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970) (internal citation omitted). "An indictment . . . founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause . . .[I]t is incumbant on

one who relies on such an exception to set it up and establish it." United States v. Titterington, 374 F.3d 453, 456 (6th Cir. 2004) (quoting McKelvey v. United States, 260 U.S. 353, 357, 43 S. Ct. 132, 67 L.Ed. 301 (1922)). An indictment is not defective for omitting language of statutory exception because such language is "not a critical element of the offense that must be specifically alleged in the indictment," as it is more akin to an affirmative defense. United States v. Neal, 692 F.2d 1296, 1303 (10th Cir. 1982); see also, United States v. Sims Brothers Construction, Inc., 277 F.3d 734, 741 (5th Cir. 2001); Weinstein v. United States, 11 F.2d 505 (1st Cir. 1926).

B. The Drug Paraphernalia Statute.

The relevant statute, 21 U.S.C. § 863(a)(1) makes it unlawful to sell or offer for sale drug paraphernalia. Section 863(d) defines "drug paraphernalia" as "[a]ny equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter." (Emphasis supplied.) The statute also includes a non-exhaustive list of examples of drug paraphernalia such as

water pipes, roach clips, miniature spoons, bongs, cocaine freebase kits, and glass pipes. 21 U.S.C. § 863(d).

The leading case interpreting the drug paraphernalia statute is Posters N' Things, Ltd. v. United States, 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994). Although that decision interpreted 21 U.S.C § 857, which preceded 21 U.S.C § 863, the two statutes are identical in all respects except that section § 863(a) eliminates "transportation in interstate or foreign commerce" as an element of the offense. See United States v. Myers, 94 F.3d 150, 151 (4th Cir. 1996) (applying Posters N' Things to Section 863). In Posters N' Things, the Supreme Court held that the term "primarily intended . . . for use" in the statute "is to be understood objectively and refers generally to an item's likely use. Rather than serving as the basis for a subjective scienter requirement, the phrase 'primarily intended or designed for use' in the definitional provision establishes objective standards for determining what constitutes drug paraphernalia." Id. at 521-522 (emphasis supplied). In United States v. Marshall, 332 F.3d 254, 260 (4th Cir. 2003), the Court, relying on Posters N' Things, concluded that "the 'objective' nature of the definition of `primarily intended' reached 'beyond the category of items that are likely to be used with drugs by virtue of their objective features,' and included, under certain

circumstances, mixed-use items," such as mannitol which is often used as a cutting agent for heroin. Marshall, 332 F.3d at 260 (quoting Posters N' Things, 511 U.S. at 521 n.11). As Posters N' Things recognized, while certain items such as razor blades or scales, as a general class, may not be designed specifically for use with drugs, a subset of those items may be "primarily intended" for such use " by virtue of the circumstances of their display and sale." Id. at 521.

Next, the Posters N' Things Court turned to the scienter requirement of the statute. The Court concluded that, to be liable under the statute, a defendant must act "knowingly." The Court elaborated as follows:

> Requiring that a seller of drug paraphernalia act with the 'purpose' that the items be used with illegal drugs would be inappropriate. The purpose of a seller of drug paraphernalia is to sell his product; the seller is indifferent as to whether that product ultimately is used in connection with illegal drugs or otherwise. If 857 required a purpose that the items be used with illegal drugs, individuals could avoid liability for selling bongs and cocaine freebase kits simply by establishing that they lacked the conscious object that the items be used with illegal drugs.

Id. at 523-24 (emphasis provided). Rather, the Court held that "it is sufficient that the defendant be aware that customers in general are likely to use the merchandise with drugs. " Id.

(emphasis supplied). In other words, the defendant need only have knowledge of the "probable consequences" of his actions, and need not have "specific knowledge" that "a particular customer actually will use an item of drug paraphernalia with illegal drugs." Id.; see also Myers, 94 F.3d at 152 (the government must only prove that 'it is sufficient that the defendant be aware that customers in general are likely to use the merchandise with drugs.").

III. Analysis

A. Counts I-III of the Indictment are Sufficient on their Face.

The language in Counts I – III tracks the statutory language and clearly places the defendant on notice as to the criminal conduct with which he is charged. In addition to setting forth a time and place where the illegal act took place, each count provides that the defendant "did knowingly sell and offer for sale drug paraphernalia, as that term is defined in 21 U.S.C. § 863(d)." By referencing § 863(d), the indictment necessarily incorporates the entirety of that provision, which provides as follows:

> The term drug paraphernalia means any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, . . . injecting . . . or otherwise introducing into the human body a

> controlled substance, possession of which is unlawful under this subchapter.

Accordingly, defendant's argument that the Indictment somehow omits reference to the controlled substance being unlawfully possessed is without basis.

Indeed, the indictment arguably contains surplusage in that it goes on to provide the defendant with additional information of the specific items of drug paraphernalia he distributed and for what purpose. Compare Indictment in United States v. David A. Sil, Cr. No. 05-55M, (D. MO 2005) (Attached here as Ex. 1) (conviction upheld, motion to dismiss denied); Indictment in United States v. Danilo Deleon, Cr. No. 06-00218 (D. N.H. 2006) (Attached here as Ex. 2) (case pending, motion to dismiss indictment denied). Thus, in Counts I and II, the indictment specifies that defendant knowingly sold and offered to sell "oil-filled ampoules, hypodermic needles, and syringes which were primarily designed and intended to be used in the "converting, preparing injecting, and ingesting of anabolic steroids, Schedule III controlled substances . . . ." This language is surplusage as it provides the defendant with information that is above and beyond the elements of the offense. The fact that Count III does not make reference to anabolic steroids in particular, but just controlled substances in general, again is without import. The

identity of the controlled substance is not an element of the offense and thus need not be alleged at all. Thus, all three counts of the Indictment "elucidate[ ] the elements of a crime, enlighten[ the] defendant as to the nature of the charges against which [] he must defend, and enable[] him to plead double jeopardy in bar of future prosecutions to the same offense.'" Sepulvada, 15 F.3d at 1192 .

B. Defendant need not know that his customers unlawfully possess a controlled substance.

Defendant's position that the indictment should include an allegation that defendant knew that his paraphernalia was to be used with unlawfully possessed anabolic steroids fails for a number of reason. First, defendant is simply wrong on the "knowledge" requirement in 21 U.S.C. § 863. It is telling that defendant's Memorandum does not cite to a single case interpreting the statute and is silent about the Supreme Court precedent in Posters N' Things. Second, defendant's argument presents a mixed question of law and fact and therefore cannot be disposed of at this stage of the litigation.

The government need not prove, let alone allege, that the defendant knew that his customers in fact possessed any particular type of controlled substance unlawfully. As the Supreme Court stated in Posters N' Things, "[r]equiring that a

seller of drug paraphernalia act with the 'purpose' that the items be used with illegal drugs would be inappropriate. The purpose of a seller of drug paraphernalia is to sell his product; the seller is indifferent as to whether that product ultimately is used in connection with illegal drugs or otherwise." Id. at 523-34. Thus, "it is sufficient that the defendant be aware that customers in general are likely to use the merchandise with drugs." Id. The government has not found any precedent, nor has defendant cited to any, in support of his contention that defendant must know that his customers will in fact utilized the drug paraphernalia with (1) a specific drug, and (2) that is unlawfully possessed. Rather, the statute requires only that the seller be aware that customers "in general" are "likely" to use the paraphernalia in connection with "illegal drug." See also, Myers, 94 F.3d at 152; Marhsall, 332 F.3d at 260-62. This makes sense: the statute does not criminalize drug possession, it criminalizes the sale of products that facilitate and contribute to unlawful drug use. The same items of drug paraphernalia can often be used with different types of drugs. The point of Posters N' Things, was that a conviction under this statute would be upheld if the Government could prove that the "defendant contemplated, or reasonably expected under the circumstances, that the item sold or offered for sale would be

used with illegal drugs." Posters N' Things, 511 U.S. at 524 n.13 (quoting United States v. Mishra, 979 F.2d 301, 307 (3rd Cir. 1992)).

The way to establish *this* knowledge, as in any other case, is at trial, through evidence, and not at the pleading stage. As the facts above demonstrate, THOMSEN's e-mails with the CS demonstrate that he knew that the CS would be using the "kits" sold by THOMSEN to convert anabolic steroids, to wit Trenbolone and Testosterone Propionate into injectable liquids for the CS's own use. Trenbolone is a veterinary drug not approved for any human uses by the FDA. Similarly, while Testosterone may be obtained legally, through a prescription, it cannot be obtained legally by an end user in a powder form that has to be re-constituted and injected. Furthermore, THOMSEN's discussion about Clenbuterol demonstrate that, while he is willing to sell it, along with other paraphernalia, he is not willing to discuss it, because doing so would certainly expose him to criminal liability. Finally, the manner in which THOMSEN displayed and advertised his business, through websites such as "steroidology," "anabolicminds," and magazines such as "Planet Muscle," render his claim that such drugs could have been sold by him for veterinary use almost laughable. In light of the evidence collected in this case, the surrounding circumstances regarding

the sale of this paraphernalia reasonably leads to the conclusion that THOMSEN knew that the "probable consequence" of his drug paraphernalia sales was that it would be used in conjunction with illegally possessed drugs. See Marshall, 332 F.3d at 260-61; Mishra, 979 F.2d at 308; United States v. Schneiderman, 968 F.2d 1564, 1567 (2d Cir. 1992), cert den'd, 507 U.S. 921 (1993).

## C. The Indictment need not Plead Statutory Exceptions and Affirmative Defenses.

Finally, defendant also argues that the Indictment must be dismissed because there are circumstances under which anabolic steroids may be lawfully possessed. Defendant relies on 21 U.S.C. § 802(41)(B)(I), excepting anabolic steroids which are expressly intended for administration to cattle or nonhuman species. Defendant also makes an oblique reference to the fact that anabolic steroids may be lawfully prescribed to individuals, and therefore are not always unlawfully possessed. *Assuming arguendo* that an end use could obtain a legitimate prescription for a raw, unconstituted, powder steroid, the fallacy of this argument becomes apparent when one seeks to apply it to any other indictment charging an offense under the Controlled Substance Act. When the government prosecutes a defendant for unlawful possession or distribution of any Schedule I, II, or III drug,

the government need not plead in the indictment that the defendant was not a (1) pharmacist, (2) physician, or (3) a patient with a valid prescription, all of whom would be exempt from prosecution through various provisions of Chapter 13 of Title 21. It is undeniable that possession of codeine, morphine, methadone, oxycodone, and various other controlled substances could very well be legal under certain circumstances. See, e.g., 21 U.S.C. § 823 (governing the registration requirements for manufacturers, distributors, and practitioners who dispense controlled substances); 21 U.S.C. § 829 (governing the manner in which Schedule II and III controlled substances may be lawfully dispensed). However, the government need not plead these exemptions or anticipate affirmative defenses in the Indictment. McKelvey, 260 U.S. at 357 ("an indictment or other pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by proviso or other distinct clause.").

In the case of the Controlled Substance Act, Section 885 of Title 21 makes explicit what has otherwise been a well-established cannon of construction of criminal statutes:

> It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading, or in any trial, hearing, or other proceeding

> under this subchapter, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit.

21 U.S.C. § 885(a)(1). This provision has been interpreted by numerous courts to mean that when the government indicts a physician for the unlawful distribution of a controlled substance under 21 U.S.C. § 841(a)(1), it need not allege in the indictment that the physician was acting outside the course of his professional medical practice. United States v. Steele, 147 F.3d 1316, 1319-20 (11th Cir. 1998); United States v. Polan, 970 F.2d 1280, 1282 (3rd Cir. 1992); United States v. Seelig, 622 F.2d 207, 211-12 (6th Cir. 1980); United States v. Roya, 574 F.2d 386, 391 (7th Cir. 1978). That situation is directly analogous to the present case: yes, there are circumstances under which anabolic steroids may be lawfully possessed and distributed, however the government need not anticipate such circumstances in its indictment. They are in the nature of affirmative defenses that the defendant would be free to raise at trial.

It is sufficient for the Indictment to allege, as it does here, that the defendant knowingly sold or offered for sale drug paraphernalia, as is defined by the statue. At trial, the government would have to establish beyond a reasonable doubt that the defendant knew it was a likely consequence of these sales

that the items would be used with unlawfully possessed controlled substances. The burden would then shift to the defendant to show that he reasonably believed that the items would be used with items lawfully possessed under the Controlled Substance Act.

Conclusion

In sum, none of the arguments defendant raises in support of his motion to dismiss Counts I, II and III of the Indictment have any merit. Accordingly, the government respectfully requests that defendant's motion be denied.

Respectfully submitted,
UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Adi Goldstein
ADI GOLDSTEIN
Assistant U.S. Attorney
RI Bar #6701
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email adi.goldstein@usdoj.gov

CERTIFICATE OF SERVICE

On this 4th day of September, 2007, I caused the Government's Memorandum of Law in Support of its Objection to Defendant's Motion to Dismiss Counts I-III of the Indictment to be filed electronically and it is available for viewing and downloading from the ECF system.

Edward C. Roy
Federal Defender Office
10 Weybosset Street, 3rd Floor
Providence, RI 02903

/s/ Adi Goldstein
ADI GOLDSTEIN
Assistant U.S. Attorney
RI Bar #6701
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email adi.goldstein@usdoj.gov